UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
S.B. and S.B., Individually and on Behalf of C.B.

                    Plaintiffs,                      MEMORANDUM AND ORDER
                                                        15-CV-1869

      - against -


New York City Dep't of Educ. et al.,

                    Defendants.
-------------------------------------------------------x
GLASSER, Senior United States District Judge:

       Plaintiffs S.B. and S.B. (individually, the "Mother" and "Father" and together, the

"Parents") are the parents of C.B., an elementary school student with a speech and language

disability. They bring this action against the New York City Department of Education ("DOE")

for violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 et

seq., Section 504 of the Rehabilitation Act, and New York law, 8 N.Y. Comp. Codes R. & Regs.

("NYCRR") §§ 200.1 et seq. The Parents allege that the DOE failed to offer C.B. a free and

appropriate public education, and seek tuition reimbursement for her attendance in private school

for the 2012-2013 school year during which she was eight years old and in second grade. The

arents exhausted their administrative remedies before two separate administrative hearing

officers, both of whom held in favor of the DOE. Before the Court are the parties' cross-motions

for summary judgment.

## GLOSSARY

| | |
|---|---|
| 12:1:1 | A special education classroom with 12 students, one teacher and one paraprofessional |
| C.B. | The student at issue in this case |
| CSE | Committee on Special Education |
| DOE | New York City Department of Education |
| FAPE | Free and appropriate public education |
| IDEA | Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. |
| IHO | Impartial Hearing Officer |
| IEP | Individual Education Program |
| JCSE | Jewish Center for Special Education |
| S.B. & S.B. | Plaintiffs and the parents of C.B. |
| SRO | State Review Officer |

## STATUTORY FRAMEWORK

The IDEA establishes a comprehensive program for providing federal funds to assist the states in educating disabled children. In exchange for that federal assistance, the recipient state is required to ensure that disabled students receive a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. §§ 1400(d)(1)(A); 1412(a). A "free appropriate public education" (commonly referred to as a "FAPE") is defined as special education and related services that are "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S.Ct. 988, 999 (2017). Critically, the special education program must be "tailored to meet the unique needs of a particular child." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) citing Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 207 (1982).

The law requires that at least annually, the needs and services of a disabled child be described in an Individual Education Program ("IEP").  20 U.S.C. § 1414(d).  As the "centerpiece" of the IDEA, "the IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  Honig v. Doe, 484 U.S. 305, 311 (1988); see also R.E. v. New York City Dept. of Educ., 694 F.3d 167, 175 (2d Cir. 2012).  In New York, IEPs are created by local Committees on Special Education ("CSEs").  N.Y. Educ. Law § 4402(1)(b)(1).  Each child's CSE team must conduct an IEP meeting at least annually to review the child's progress and needs and to create a new IEP for the upcoming year.  20 U.S.C. § 1414(d)(2)(A).

If dissatisfied with the IEP or the proposed placement, as here, a parent may choose to enroll their child in a private school at their own financial risk, and later seek tuition reimbursement from the DOE.  To obtain reimbursement, the parent initiates an administrative due process proceeding by filing a complaint setting forth all of their challenges to the IEP.  20 U.S.C. § 1415(b)(6).  The parents may challenge "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education."  Id.  Such challenges are addressed in a due process hearing before an Impartial Hearing Officer ("IHO") at which the DOE has the burden of proof and persuasion.  N.Y. Educ. Law § 4404(1)(c); M.W. ex rel. S.W. v. N.Y. City Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013).  Either party may appeal the IHO's decision to a State Review Officer ("SRO"), 20 U.S.C. § 1415(g)(1); see also N.Y. Educ. Law § 4404, and either party may then appeal the SRO's decision by initiating an action in state or federal court.  20 U.S.C. § 1415(i)(2)(A).

## FACTUAL BACKGROUND

The following facts are drawn from the administrative record and the parties' Local Rule 56.1 Statements of Undisputed Facts. They are undisputed unless otherwise noted.

<u>C.B.'s General Background</u>

C.B. was born on July 11, 2004 and is currently thirteen years old. ECF 15-1, Plaintiff's Rule 56.1 Statement ("Pl. 56.1 St."), at ¶ 1 n.2. At issue in this case is the 2012-2013 school year, during which C.B. was eight years old and a second grade student. <u>Id.</u> at ¶ 2. C.B. has been classified by the DOE as a student with a speech or language impairment who is eligible to receive special education services under the IDEA. <u>Id.</u>; ECF 14-1, Defendants' Rule 56.1 Statement ("Def. 56.1 St."), at ¶ 3. From age four to six, she attended general education programs in private schools and received supplemental services from the DOE, including occupational therapy, speech and language therapy and a Special Education teacher. Pl. 56.1 St. at ¶ 5.

<u>The 2011-2012 IEP and School Year</u>

The Student's CSE team met on March 31, 2011. The DOE had failed to conduct an IEP meeting for C.B. the prior two years and notified the Parents of the meeting the day before it took place. Ex. B at pp. 3-4.[1] After finalizing the IEP, the DOE offered C.B. a placement in a public school for the 2011-2012 school year, during which she was seven years old and in first grade. <u>Id.</u> The Parents rejected the school placement for reasons that are disputed and irrelevant to this case. Instead, they enrolled C.B. at the Jewish Center for Special Education ("JCSE") for the 2011-2012 school year, and initiated a due process proceeding challenging the IEP, and

---

[1] Citations to exhibits ("Ex.") and the transcript ("Tr.") refer to the administrative record.

seeking reimbursement for the JCSE tuition.  Pl. 56.1 St. at ¶ 8.  While that proceeding was

pending, C.B. completed the 2011-2012 school year at the JCSE.[2]

The 2012 Evaluations and Progress Reports

The CSE was due to re-convene for C.B.'s 2012 annual IEP meeting regarding the

upcoming 2012-2013 school year in March 2012.  In anticipation of that meeting, the DOE sent

the Parents a notice on January 9, 2012 stating that the "student's educational or related services

needs warrant a reevaluation (this includes improved academic achievement and functional

performance)," and that it needed "updated clinical informations [sic] for the annual review."

Ex. 1.  It also requested reports from C.B.'s current school that would provide "a summary of the

student's present levels of performance in both Academic and Social/Behavioral areas."  Id.

There are five reports in the record regarding C.B. that pre-date the 2012 IEP meeting.

The JCSE created three progress reports (hereinafter, the "Progress Reports"): (1) an Academic

Progress Report dated February 9, 2012; (2) a Speech Progress Report dated February 2012; and

(3) an Occupational Therapy Update dated March 2011.[3]  Def. 56.1 St. at ¶ 7; Exhs. 4, 5, 6.  A

representative from the DOE, Melody Fuchs, conducted a one hour classroom observation of

C.B. at the JCSE on March 6, 2012 and summarized her findings in a classroom observation

report.  Ex. 3; Pl. 56.1 St. at ¶¶ 12, 13.  Finally, there was a psychoeducational report of C.B.

---

[2] The IHO issued a decision regarding the 2011-2012 school year on November 12, 2012.  Ex. B.
The IHO held that the DOE's failure to present a case in chief, and its failure to defend the IEP
and proposed school placement, constituted a "concession" that it had not offered C.B. a FAPE
for that school year.  Id. at p. 11-12.  The DOE was ordered to (1) reimburse the Parents for the
JCSE tuition for the 2011-2012 school year, (2) "immediately conduct a speech and language
evaluation and an occupational therapy evaluation of the student" and (3) "reconvene the CSE to
consider the results of those evaluations and any other relevant evaluations and/or information
received and produce a new IEP for the student."  Id. at p. 14.
[3] The Occupational Therapy Update is dated March 2011, however Plaintiffs indicate that that
date is likely a typographical error and should actually be March 2012.  Pl. 56.1 St. at ¶ 18 n. 4.

completed by a school psychologist dated March 6, 2011 (the "Psychoeducational Report").  Ex. 9.  A brief summary of each report follows.

        i.      The Academic Progress Report (created by the JCSE)

The Academic Progress Report describes C.B. as "sweet," "well-behaved" and "well-liked," but with "delays in her expressive and receptive language skills."  Ex. 4.  It states that C.B. has trouble following directions, completes tasks slowly and "struggles to retrieve words, which impedes her ability to express her thoughts" coherently.  Id.  The report states that C.B. identifies "several letters of the alphabet" and can write some letters properly.  She can answer "oral comprehension questions after listening to stories with 80% accuracy," and can work independently for 15 minutes.  Id.  She needs to develop phonological awareness, such as rhyming and blending syllables.  Id.  In math, C.B. can complete two-digit addition problems, simple subtraction problems and can count by fives and tens through one hundred.  Id. at pp. 1-2. The report notes a number of modifications and management tools that the teacher uses, including (1) repetition, (2) multi-sensory techniques, such as hands-on activities and games, (3) small group instruction, (4) motivational activities, (5) visual aids, and (6) presenting information in "small chunks."  Id.

        ii.     The Speech Progress Report (created by the JCSE)

According to the Speech Progress Report, C.B. has language delays "in the areas of comprehension, use of age-appropriate vocabulary, and auditory processing of complex directions and sentence structure."  Ex. 6.  C.B. has difficulty following even simple directions, particularly those with spatial terms, and struggles to express herself saliently.  Id.  She also "demonstrates difficulty with pragmatic skills," including a "lack of awareness and repair skills when there is a communication breakdown," in which case she "sits passively and does not

indicate lack of comprehension." Id. This report emphasizes the following management techniques: (1) sequencing cards and pictures, (2) direct instruction, (3) verbal cueing, and (4) opportunities to practice various skills. Id.

     iii.    The Occupational Therapy Update (created by the JCSE)

The Occupational Therapy Update explains that C.B. has "low postural tone," "decreased muscle strength" and "low endurance level," which results in "difficulty performing fine motor, prewriting and graphomotor skills." Ex. 5. It describes her as a "sweet and friendly" child who has "good attention span," but has "difficulty following simple directions and processing auditory information" and "poor problem solving skills." Id. The report describes the dexterity of her fingers, hands and arms to perform certain tasks, concluding that "[t]his is all indicative of a weak upper body." Id. Her writing is "slow and laborious," she has difficulty writing letters, tracing and imitating patterns, cutting shapes and completing puzzles. Id. C.B.'s "decreased self and spatial awareness [] interferes with visual motor and perceptual skills." Id.

     iv.    The Classroom Evaluation Report (created by the DOE)

The classroom evaluation was conducted by Melody Fuchs, who was also a member of C.B.'s CSE team and testified before the IHO on behalf of the DOE. See infra. She was unfamiliar with C.B except for the classroom observation and IEP reviews. Tr. 247. She evaluated C.B. in her classroom at the JCSE in which there were six students, one teacher and one assistant. Ex. 3. Ms. Fuchs observed an art/writing activity during which the students wrote about and illustrated what they had seen during a recent field trip. Id. In an attempt to write the word "supermarket," C.B. wrote "SPMKT," reversing the letter "P." Id. She also wrote "I S IKM" for "I saw ice cream." Id. During recess time, the class voted on whether they would stay inside or go outside. C.B. "did not participate in this count, but just sat quietly at her desk." Id.

In conclusion, Ms. Fuchs wrote, "[t]eacher related that [C.B.] knows only half of the alphabet letters and/or sounds at this time. [C.B.] is not being taught to write words, but only the sounds that she hears within the words." Id.

       v.      The Psychoeducational Report

The Psychoeducational Report notes that C.B. "did not appear to understand directions and benefited from constant and consistent repetition." Ex. 9 at pp. 1, 4. C.B. was "fidgety," "easily distracted," and she had "difficulty sustaining attention, understanding and following directions . . ." Id. at p. 1. C.B. has a borderline I.Q. score of 75, which is in the 5th percentile for children her age. Id. In particular, the evaluator noted that she was in the "extremely low range" for working memory, which is the "ability to temporarily retain information in memory, perform some operation or manipulation with it, and produce a result," such as the "ability to attend to a simple math question and retrieve information from memory to answer it." Id. at p. 2. In all areas, C.B. (who was six at the time of the test) tested at a "below kindergarten" level. Id. at p. 3. The evaluator offered a number of instructional modifications for C.B., including (1) preparing C.B. before she is called upon to answer a question, (2) establishing eye contact prior to giving instructions or introducing new material, (3) allowing additional processing or rehearsal time, (4) using manipulative, charts and diagrams, (5) introducing new concepts in a variety of ways—oral, written, graphic and pictorial, and (6) restatement by the student of directions. Id. at p. 4. The report concludes as follows:

> In sum, [C.B.]'s overall level of cognitive functioning appears within the Borderline range with relative weaknesses in her working memory skills and her ability to define words. Academic skills appear to be below grade level. She presents as a charming child who is motivated to learn and to please. Id.

<u>The 2012 IEP Meeting</u>

The IEP meeting took place on April 26, 2012. Pl. 56.1 St. at ¶ 10. The following members of the CSE team were present at the meeting: (1) Melody Fuchs, as DOE special education teacher and District Representative, (2) the Mother, (3) Elisheva Weiss, the DOE school psychologist, (4) Sharon Granger, parent member, (5) Raizy Link, C.B.'s classroom teacher at the JCSE (by telephone), and (6) Chavi Rabinowitz, principal at JCSE. <u>Id.</u> at ¶ 11.

The main dispute regarding that meeting centers on the Psychoeducational Report and the three Progress Reports. The DOE claims that those four reports were discussed during the meeting and later considered when creating C.B.'s IEP. Def. 56.1 St. at ¶¶ 7-11. The Parents maintain that those reports were not discussed during the meeting. Pl. 56.1 St. at ¶ 20; Tr. 273, 307-10. It is undisputed that Ms. Fuchs' classroom evaluation report was reviewed at the meeting.

At the end of the meeting, the DOE offered, and the Parents agreed, to a Notice of Deferred Placement which allowed C.B. to complete the 2011-2012 school year at JCSE. Ex. 7. That notice stated that the Parents would receive a final notice of C.B.'s school placement for the 2012-2013 school year by August 15, 2012. <u>Id.;</u> <u>see</u> <u>also</u> Pl. 56.1 St. at ¶ 59.

<u>The 2012-2013 IEP</u>

Following the meeting, C.B.'s IEP for the 2012-2013 school year was finalized. Ex. 2 (hereinafter, the "IEP"). The IEP is divided into a number of sections, as follows in relevant part:

  i.  Present Levels of Performance and Individual Needs

This section provides written summaries of C.B. in various categories: (1) Evaluation Results, (2) Academic Achievement, Functional Performance and Learning Characteristics, (3)

Social Development, (4) Physical Development, (5) Management Needs, and (6) Effect of Student Needs on Involvement and Progress in the General Education Curriculum. Id. at pp. 1-2. Under each subsection, the IEP asks for a (a) summary of the student's abilities and development in that area, (b) the student's strengths in that area, and (c) the needs of the student in that area, including areas of concern for the parents. Id.

Under the first subsection, Evaluation Results, the IEP describes C.B.'s school history, and notes that the curriculums at the private schools she had attended in previous years "emphasize[d] Judaic Studies, math and science." Id. at p. 1. Because "students are primarily taught in Hebrew and Yiddish . . . it should be noted that this is [C.B's] first in school exposure to reading and writing in English." Id.[4]

The next three subsections are copied directly from the Progress Reports. Compare IEP at pp. 1-2 to Exhs. 4, 5, 6. Under "Academic Achievement, Functional Performance and Learning Characteristics," the summary is taken virtually verbatim from the Academic Progress Report and, in smaller part, from the Speech Progress Report. Compare IEP at pp. 1-2 to Exhs. 4, 6. The next subsection, "Social Development," is copied directly from the Academic Progress Report. Compare IEP at p. 2 to Ex. 4. It adds that C.B. is motivated to learn and please others, persists in the face of challenging tasks, and benefits from "modeling, praise and encouragement." IEP at p. 2. It lists "counseling" as C.B.'s need in this category, without further explanation. Id. The next subsection, "Physical Development," tracks the Occupational Therapy Update verbatim. Compare IEP at p. 2 to Ex. 5. It states that C.B. has trouble

_____

[4] The Parents argue that this statement is inaccurate, and that C.B. had previously received instruction in English. In light of our other holdings, infra, the Court need not address that argument.

following simple directions and processing auditory information, and presents with decreased muscle strength and low endurance, which interferes with her progress.  IEP at p. 2.

The final two subsections divert from the Progress Reports.  Under Management Needs, the IEP offers no summary or overview of C.B.'s strengths, and as for her needs it reads "none needed."  Id.  Under "Effect of Student Needs on Involvement and Progress in the General Education Curriculum," it states that C.B. "can participate in all appropriate areas in the general education environment with needed academic supports, counseling, speech/language therapy and occupational therapy."  Id.

ii.     Student Needs Relating to Special Factors

This section lists 15 annual goals for C.B in the areas of speech, reading, phonetic awareness, math, counseling, social skills and occupational therapy.  IEP at pp. 3-6; see also Tr. 74-76, 363-66.  Progress under each of the goals is to be measured once a month.  IEP at pp. 3-6.

iii.     Recommended Special Education Programs and Services

This section of the IEP recommends a special education program for C.B.  IEP at pp. 6-7. It recommends that for all academic subjects she be placed in a special class in a community school[5] that has not more than 12 students, one teacher and one paraprofessional in the classroom, commonly called a 12:1:1.  Id.  It recommends that she receive three related services: speech/language therapy, occupational therapy and counseling.  Id.  It also requires C.B. to participate in the same district-wide assessments administered to general education students with

---

[5] A "special class" is "one that includes only students with disabilities, and is intended for students whose needs cannot be met within the general education class."  Def. 56.1 St. at ¶ 16 n. 3.  Community schools have a "mixed population of disabled and non-disabled students."  Id. at ¶ 16 n. 4.

certain modifications, which include extended time, that the directions and questions be read aloud and that she be tested in a room with no more than seven other students.  Id. at p. 8.

    iv.    Summary

This section states that C.B.'s instructional/functional levels in reading and math are at a kindergarten and first grade level, respectively.  Id. at p. 9.  It classifies her disability as a Speech or Language Impairment.  Id.  Under a subsection titled "Promotion Criteria," it requires that C.B. meets 35% of the second grade English standards and 40% of the second grade math standards in order to be promoted to the next grade.  Id. at p. 10.

This section also notes whether and which other special education programs were considered for C.B.  Id.  It states that the CSE also considered, and rejected, an IESP with SETSS.[6]  Id.; see also Def. 56.1 St. at ¶ 16.  A special class in a special school was deemed too restrictive for C.B.  IEP at p. 10.[7]  It also reads that the Mother "stated that she would like an IEP to explore programs that would be appropriate for her daughters' academic needs and intends to seek tuition reimbursement . . . parent stated that she would like an IEP at this time."  Id.

Public School Placement for the 2012-2013 School Year

By August 17, 2012, the Parents had not received a final notice from the DOE with C.B.'s school placement for the upcoming year, and the Mother contacted the DOE to inquire.  Pl. 56.1 St. at ¶ 60.  On August 21, 2012, the Parents received a notice advising that C.B. had been placed in P.S. 91-The Albany School ("P.S. 91") in a special class with a 12:1:1 ratio.[8]  Pl.

---

[6] Under this program, C.B. would remain in private school and pay her own private school tuition, but the DOE would provide supplemental services or teachers for support.  Def. 56.1 St. at ¶ 16 n. 5, 6; ECF 14-2, Def. Memo. of Law, p. 10 n. 5, 7.

[7] A "special school" is a school with only special education students.  The IDEA requires that student be placed in the "least restrictive environment" possible.  20 U.S.C. § 1412(a)(5)(A).

[8] The Notice is dated July 25, 2012.  The family moved residences and provided the DOE with their new address, but the Notice was sent to their former address and never received.  Tr. 277.

56.1 St. at ¶ 61; Ex. 8.  The notice did not specify the classroom in which C.B. was placed.  Id.

The Mother immediately attempted to visit P.S. 91 but was told that she could not visit until the

school re-opened in the fall.  Pl. 56.1 St. at ¶ 62; Tr. 276.

On August 22, 2012, the Mother wrote to the DOE to notify them of her inability to visit

P.S. 91.  Ex. L.  She stated her intention to visit as soon as possible and requested information

"about the recommended program such as a class profile and program description."  Id.; see also

Pl. 56.1 St. at ¶ 63; Tr. 276-77.  She never received a response.  Pl. 56.1 St. at ¶ 64.  In the

meantime, the Parents re-enrolled C.B. at the JCSE for the 2012-2013 school year.  Exhs. E, F.

In early September 2012, the Mother toured P.S. 91 with Carol Hoyte, the Special

Education Coordinator at that school.  Pl. 56.1 St. at ¶ 65.  She observed a classroom that was

not the class into which C.B. was to be placed.  Tr. 299-300.  On September 28, 2012, the

Mother wrote to the CSE regarding her concerns about the IEP, the 12:1:1 class recommendation

and the school placement.  Ex. D; see also Pl. 56.1 St. at ¶ 75.  The letter asks the DOE to "let

me know if anything I have indicated in this letter about the CSE meeting or recommended

placement is inaccurate."  Ex. D at p. 2.  The letter notifies the DOE that the Parents rejected the

placement at P.S. 91, had enrolled C.B. at the JCSE for the 2012-2013 school year, and planned

to seek reimbursement through an impartial hearing.  Id.  The DOE never responded to that

letter.  Pl. 56.1 St. at ¶ 76.  C.B. remained at the JCSE for the duration of the 2012-2013 school

year, the tuition for which totaled $53,900.  Id. at ¶¶ 77, 88.


The Due Process Complaint and the Remaining 2012-2013 School Year

On November 12, 2012, the IHO issued its decision regarding the 2011-2012 school year.

See supra note 2.  Days later, on November 21, 2012, the Parents timely filed a due process

complaint challenging the 2012-2013 IEP and proposed placement, and seeking reimbursement for tuition at JCSE for that school year.  Ex. A; Pl. 56.1 St. at ¶ 87.  The Due Process Complaint seeks reimbursement for C.B.'s tuition at the JCSE and alleges violations of the IDEA related to (1) the evaluations of C.B. that were conducted and considered in creating the IEP; (2) the 12:1:1 class size recommendation; (3) the IEP's present levels of performance and goals sections; (4) the CSE's failure to properly notify and include the parents in various aspects of the IEP's creation, and (5) the placement of C.B. in P.S. 91.  Ex A.

After the Due Process Complaint was filed, the IHO issued a notice of pendency pursuant to 20 U.S.C. § 1415(j), which requires the student's placement remain "as is" during the pendency of an administrative review.  See Interim Order on Pendency, dated January 3, 2013. C.B.'s placement at the JCSE for the 2011-2012 school year, pursuant to the IHO's November 12, 2012 decision, constituted the status quo while the proceedings were pending.  Id.  As such, the DOE paid the remaining JCSE tuition for the 2012-2013 school year for the period between November 21, 2012 and June 2013.  Pl. 56.1 St. at ¶ 90.

IHO Hearing and Decision Regarding the 2012-2013 School Year

A hearing before a new IHO regarding the 2012-2013 school year was held over five non-contiguous days between December 2012 and April 2013.  Ms. Fuchs was the DOE's first witness, and testified regarding the classroom evaluation she conducted at the JCSE, the IEP meeting, the creation of the IEP and the placement of C.B. at P.S. 91.  At various points in her testimony, which took place via telephone, the IHO reprimanded her for reading directly from the IEP, or other exhibits, when it was clear that she was inappropriately doing so in response to a question.  Tr. 50-51, 72-73.

The DOE's second and final witness was Ms. Hoyte, the special education coordinator at P.S. 91. Ms. Hoyte had never met C.B., and she testified about C.B.'s skills and needs based solely on her reading of the IEP. Tr. 151. She also testified about the services available at P.S. 91. Tr. 146-50. During her testimony, the Parents learned for the first time that if C.B. had attended P.S. 91, she would have been placed in a fourth grade class. Tr. 151.

Three witnesses testified for the Parents. The first was Chana Bailey Rosen, C.B.'s teacher at JCSE for the 2012-2013 school year. Ms. Rosen testified to C.B.'s present levels of performance, her progress throughout that school year, the educational setting at the JCSE and the various modifications and tools that the teachers used to address C.B.'s needs. The Mother testified second regarding the IEP meeting and creation of the IEP, her impressions of P.S. 91 and C.B.'s progress at the JCSE. Finally, Chavie Rabinowitz, the principal at the JCSE, testified regarding the JCSE and the adequacy of the IEP in relation to her understanding of C.B.'s functioning and deficiencies. She testified to knowing C.B. well, seeing her every day and being in regular contact with her teachers and therapists. Tr. 333, 339-41.

On June 25, 2013, the IHO issued a decision holding that 1.) the DOE provided C.B. a FAPE for the 2012-13 school year, 2.) the JCSE provided C.B. an appropriate education for the 2012-13 school year, and 3.) had the DOE failed to provide C.B. a FAPE, equities favored tuition reimbursement. See IHO's Findings of Fact and Decision, dated June 25, 2013 (hereinafter "IHO Dec."). Because the DOE had offered C.B. a FAPE, the Parents were not entitled to tuition reimbursement for their unilateral placement of C.B. at the JCSE. Id. at p. 14.

The SRO's Decision and Subsequent Events

On July 30, 2013, the Parents appealed that part of the IHO's decision holding that the DOE had provided C.B. a FAPE. The DOE cross-appealed that part of the IHO's decision

holding that the equities favored the Parents.  On December 10, 2014, the SRO issued a decision affirming the IHO.  See State Review Officer Decision, dated December 10, 2014 (hereinafter "SRO Dec.").

In lieu of a fact or background section, the SRO presumed the "parties' familiarity with the detailed facts and procedural history of the case and the IHO's decision" and offered only a brief procedural history.  Id. at p. 2.  After rehearsing pages of law (id. at pp. 3-5), the decision affirmed the IHO's holding that the DOE offered C.B. a FAPE.  Id. at 5-6.  The SRO held that the IHO accurately recounted the facts, properly evaluated the necessary evidence, and came to the correct conclusion.  Id. at p. 6.  The SRO then addressed each of the Parent's challenges to the IEP and placement.  Id. at pp. 6-9.  Because it concluded that the DOE had offered a FAPE, the SRO did not address whether the JCSE was an appropriate placement for C.B. or whether equitable factors favored the Parents.  Id. at pp. 9-10.

Having exhausted their administrative remedies, the Parents initiated this case, seeking declaratory judgments that the DOE failed to provide C.B. a FAPE for the 2012-13 school year and that equitable factors weigh in C.B.'s favor, and a judgment ordering the DOE to reimburse the Parents for the 2012-2013 JCSE tuition, along with costs and attorney's fees.  ECF 1.  The parties filed cross-motions for summary judgment which are now before the Court.  ECF 14, 15.

## LEGAL STANDARDS AND DEFERENCE

In an IDEA case, a summary judgment motion "is a pragmatic procedural mechanism" for reviewing administrative decisions that functions more like an appeal than a traditional summary judgment motion.  T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 252 (2d Cir. 2009).

This Court exercises a circumscribed <u>de novo</u> review which falls somewhere between clear-error and complete <u>de novo</u>. <u>M.W.</u>, 725 F.3d at 138; <u>M.H. v. New York City Dept. of Educ.</u>, 685 F.3d 217, 244 (2d Cir. 2012). Under that standard, "[w]e seek only to verify whether a preponderance of the evidence supports the administrative decisions based on our independent examination of the record." <u>J.D. v. N.Y. City Dep't of Educ.</u>, 677 F. App'x 709, 711 (2d Cir. 2017) (summary order) <u>citing</u> <u>M.H.</u>, 685 F.3d at 226. While the court should not simply "rubber stamp" the administrative decision, it must remain "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." <u>Walczak</u>, 142 F.3d at 129 (internal citations omitted). Thus, the Court may not substitute its own "notions of sound educational policy for those of the school authorities which they review." <u>Rowley</u>, 458 U.S. at 206.

However, the level of deference owed to an administrative decision "depends on the quality of that opinion." <u>R.E.</u>, 694 F.3d at 189. Its persuasiveness "will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." <u>M.H.</u>, 685 F.3d at 244.

In this case, the DOE urges the Court to accord particular deference to the administrative decisions because they are "in agreement and are based on the same record as that before the district court." ECF 29, Def. Reply, at p. 3, <u>citing</u> <u>B.K. v. N.Y.C. Dep't of Educ.</u>, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014). However, the Second Circuit has never instructed that increased deference is warranted simply because the IHO and SRO came to the same ultimate conclusion. To the contrary, the Court need not uphold consistent decisions by the IHO and SRO when they

are both "poorly reasoned and unsupported by the record." <u>J.D.</u>, 677 F. App'x at 711-12

(reversing the IHO and SRO's decisions uniformly holding in favor of the DOE); <u>see also</u> <u>L.O.</u>

<u>v. New York City Dep't of Educ.</u>, 822 F.3d 95 (2d Cir. 2016) (same); <u>A.M. v. New York City</u>

<u>Dep't of Educ.</u>, 845 F.3d 523 (2d Cir. 2017) (same).

     With these standards in mind, it must first be noted that neither the SRO nor IHO's

decision indicates a "genuine engagement with the Parents' claim" to warrant deference. <u>FB v.</u>

<u>N.Y. City Dep't of Educ.</u>, 132 F. Supp. 3d 522, 550 (S.D.N.Y. 2015). Instead, they are both

conclusory, generic, lacking "thorough and careful" analysis, <u>Walczak</u>, 142 F.3d at 129, and are

"tellingly, silent about [] contrary testimony" on most disputed issues. <u>F.B.</u>, 132 F.Supp.3d at

550; <u>see also</u> <u>B.R. ex rel. K.O. v. N.Y. City Dep't of Educ.</u>, 910 F. Supp. 2d 670, 678 (S.D.N.Y.

2012). The Court remains "acute[ly] aware[] of institutional competence and role" in IDEA

cases, <u>M.H.</u>, 685 F.3d at 244, however the analysis in both decisions is so wanting that one can

only speculate as to how, and in many instances <u>whether</u>, the hearing officers actually weighed

and considered the evidence before them.[9] For those reasons generally, and as reflected more

specifically herein, both decisions are entitled to diminished deference, at best.

---

[9] The SRO's decision, to which the court is to defer primarily, is particularly vague. At no point does it note any detail about the contents of the IEP, the reports that were available to the CSE, or specific testimony. Its discussion section spans just four single-spaced pages, the vast majority of which is boilerplate recitation of law and citations. SRO Dec. at pp. 6-9. On a number of points, the SRO makes a conclusion without addressing the Parents' argument at all. The IHO's decision follows a similar formula, conclusorily stating that there was no denial of a FAPE on each issue, without further explanation. IHO Dec. at pp. 9-11. The section discussing whether the DOE offered C.B. a FAPE spans three double-spaced pages, one of which is a boilerplate recitation of the applicable law. <u>Id.</u> To its credit, the IHO decision offers six double-spaced pages summarizing the parties' respective arguments and the testimony from the IHO hearing. <u>Id.</u> at pp. 3-9. However, it does not substantively describe the IEP or the reports that were available to the CSE, nor does it weigh contradictory testimony or evidence to support its conclusions.

**DISCUSSION**

To determine whether the Parents are entitled to reimbursement, the Court applies the three-part Burlington/Carter test.  Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); Sch. Comm. of Town of Burlington v. Dep't of Educ., 471 U.S. 359 (1985).  Under the first prong, the Court determines whether the DOE denied the student a FAPE.  This involves a "two-part inquiry that is, first, procedural, and second, substantive."  R.E., 694 F.3d at 189-90.  If the DOE deprived the student of a FAPE, under the second prong, the Court considers whether the Parents' unilateral private school placement was appropriate for the student.  If it was, under the third prong, the court determines whether the balance of equitable factors weigh in the parents' favor.  M.H., 685 F.3d at 245.

*I.      Prong One, Part One: Procedural Compliance*

The Parents argue that the DOE violated the IDEA on both procedural and substantive grounds, thereby depriving C.B. of a FAPE.  The IDEA's procedural requirements are intended to "guarantee parents [] an opportunity for meaningful input into all decisions affecting their child's education," Honig, 484 U.S. at 311, and to "safeguard against arbitrary or erroneous decisionmaking."  M.H., 685 F.3d at 245 (internal quotations omitted); see generally 20 U.S.C. § 1415.  New York regulations amplify the IDEA's procedural requirements.  See 8 NYCRR § 200.1 et seq.  "[T]he importance Congress attached to these procedural safeguards cannot be gainsaid."  Rowley, 458 U.S. at 205.   If there is a procedural violation, Parents are entitled to reimbursement only if the violation "i.) impeded the child's right to a [FAPE]; (ii) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (iii) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

The Parents allege that the DOE failed to reevaluate C.B. within the statutorily mandated three year time period. ECF 15-2, Pl. Memo. of Law, at pp. 15-20. They also claim that the Psychoeducational Report and the Progress Reports were not discussed during the IEP meeting or provided to them. Id. They contend that these constituted procedural violations of the IDEA that denied C.B. a FAPE and impeded their opportunity to participate in C.B.'s education.[10] The primary thrust of their argument, however, is that these procedural violations compounded to create a substantively inadequate IEP that deprived C.B. of a FAPE. Id. at pp. 21-22.

The Parents first argue that the DOE failed to conduct three reevaluations of C.B., in speech/language, occupational therapy and social history. ECF 15-2, Pl. Memo. of Law, at pp. 17-18. The law requires that a student be evaluated by the DOE prior to her initial IEP and then at least every three years thereafter. 20 U.S.C. § 1414(a)(2)(A); 8 NYCRR § 200.4(b)(4). These evaluations and reevaluations must assess a child "in all areas of suspected disability," and utilize "assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child." 20 U.S.C. § 1414(b)(3)(B-C); see also 8 NYCRR § 200.4(b)(1). It is the school district's responsibility to assure that the reports and assessments on which it relies are sufficiently accurate and complete to create an appropriate IEP. 20 U.S.C. § 1414(b)(2)(A); 8 NYCRR § 200.4(b)(5)(iii).

The SRO did not address the DOE's alleged failure to reevaluate C.B. in advance of the IEP meeting. See SRO Dec. at pp. 6-7. The IHO recognized that the DOE did not perform a speech or occupational therapy reevalution, but did not state whether that constituted a

_____

[10] The Parents argue that the CSE did not allow them to meaningfully participate in the process, primarily because the CSE had predetermined a recommended class placement for C.B. in a 12:1:1 class. ECF 30, Pl. Reply, at pp. 10-14. The Court addresses this class placement issue as part of the discussion of the IEP's substantive adequacy, infra, and need not address that issue as a separate procedural violation in light of our remaining holdings.

procedural violation. Instead, the IHO simply concluded that "there are no procedural errors tantamount to a denial of a FAPE for the student," and that "the IEP specifically noted the student's deficits in these areas and provided services to address the deficits." IHO Dec. at p. 10.

The Mother testified that C.B. was initially evaluated when she was three, almost four, years old for occupational therapy, physical therapy, speech and by a psychologist, but that the DOE had not reevaluted her since. Tr. 305-06. C.B. was three, almost four, in the first half of 2008, four years before the 2012 IEP meeting. Ms. Fuchs testified that she did not know when C.B. last received a social history evaluation, did not know whether a speech and language evaluation had ever been completed, and did not know when C.B. was first classified as having a speech and language impairment. Tr. 86-87, 90. The DOE acknowledged that C.B. was due to be reevaluted prior to the 2012 IEP meeting. See Ex. 1. It is clear, however, that the DOE did not reevaluate C.B. in those areas within the mandated three years. The failure to conduct triennial evaluations of C.B. in her areas of need is a clear violation of the IDEA and state regulations.

Additionally, "[i]n developing each child's IEP, the IEP Team must consider ... [t]he results of the initial or most recent evaluation of the child." 34 C.F.R. § 300.324(a)(1)(iii). The DOE bears the burden of demonstrating which evaluative materials were reviewed by the CSE to create the IEP to ensure that the CSE "provides the student with services narrowly tailored to his or her particular educational needs based on actual and recent evaluative data from the student's education providers." L.O., 822 F.3d at 110. There was no speech/language, occupational therapy or social history evaluation considered at the IEP meeting, and the CSE did not consider C.B.'s initial evaluations, about which the Mother testified, at the IEP meeting or when creating the IEP. Tr. 90. This constitutes a second procedural violation. See L.O., 822 F.3d at 110-11.

The Parents next argue that the CSE failed to review the Psychoeducational Report and the three Progress Reports at the IEP meeting. During the IEP meeting, the CSE must "review existing evaluation data on the child, including—(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers." 20 U.S.C. § 1414(c)(1)(A). The DOE must provide a copy of any evaluation, report or documentation to the parents. 20 U.S.C. § 1414(b)(4)(B).

The only evidence on this issue is conflicting testimony from the Mother and Ms. Fuchs. The Mother testified that the CSE did not review the Progress Reports and Psychoeducational Report at the meeting or provide them to her. Tr. 273. Ms. Fuchs claims the opposite. Tr. 60, 62, 93. The IHO credited Ms. Fuchs' testimony, holding that "all of the reports were discussed during the IEP meeting." IHO Dec. at p. 10 (the SRO did not address this issue). The objective evidence indicates that the three Progress Reports were considered. The IEP quotes them verbatim and two JCSE teachers were present at the IEP meeting: Ms. Link who authored the Academic Progress Report, and Ms. Rabinowitz, the principal, who communicated regularly with the therapists who authored the Speech Progress and Occupational Therapy reports. IEP at pp. 1-2; Exhs. 4, 5, 6.

Regarding the Psychoeducational Report, there is no evidence that it was discussed at the meeting aside from Ms. Fuchs' testimony. Although the IHO apparently ignored the Mother's conflicting testimony (IHO Dec. at p. 10), this Court must defer to the IHO who was best positioned to assess the witnesses' credibility. B.P. v. New York City Dep't of Educ., 634 F. App'x 845, 849 (2d Cir. 2015) (summary order); M.H., 685 F.3d at 258. For that reason, the Court holds that the Psychoeducational Report was reviewed at the IEP meeting.

The DOE contends that any procedural violations were inconsequential because the evaluations available at the time of the CSE meeting were sufficient to craft an adequate IEP. ECF 14-2, Def. Memo. of Law, at p. 16-17. This position is aligned with the SRO and IHO's unreasoned conclusions that "the evaluative information . . . was sufficient to develop an appropriate IEP." SRO Dec. at p. 6; IHO Dec. at p. 10. Indeed, courts have held that "the absence of one single measure should not itself render an IEP invalid, so long as the CSE team otherwise has sufficient information about the student to determine the student's educational needs." P.L. v. N.Y. Dep't of Educ., 56 F. Supp. 3d 147, 160 (E.D.N.Y. 2014); see also M.W., 725 F.3d at 140.

Here, however, it was not "one single measure" that was omitted; rather the DOE failed to conduct and consider at least three (re)evaluations of C.B. This constitutes a serious procedural violation. Moreover, the Second Circuit has expressed reservations with applying the retrospective analysis urged by the DOE, because

> . . . courts are left to speculate many months, or as in this case, many years, later as to how the CSE reached the terms of the child's IEP (i.e., which, if any, evaluative materials the CSE actually considered). The resulting implication of this procedural violation is that it provides the reviewing authority with almost unfettered discretion, as it combs through the evaluative materials generated at the time the IEP was formulated, to match terms of the IEP to any assertion contained in any existing document, irrespective of whether it was actually viewed and considered by the CSE or even in possession of the CSE at the time of the meeting . . .

L.O., 822 F.3d at 110. To the contrary, the IDEA "requires that a CSE actually review evaluative data and base the terms of the student's IEP on that information," and it does not "permit[] the reviewing body to offer post hoc rationalizations for how the CSE reached its conclusions." Id. at 110-111.

Additionally, neither the SRO nor IHO substantively addressed the evaluative materials and IEP in a manner sufficient to warrant deference. Each dedicated well under a page to this

issue, and did not engage in a careful comparison, endorsed in this circuit, of the IEP and the available reports to ensure that they were truly consistent. <u>Compare</u> SRO Dec. at pp. 6-7; IHO Dec. at p. 10 <u>to</u> <u>L.O.</u>, 822 F.3d at 110 (deferring to the SRO who "devote[d] nearly thirteen full single-spaced pages to its comparison of the terms of each IEP with the evaluative materials in existence at the time the IEP was developed"); <u>C.M. v. New York City Dep't of Educ.</u>, No. 15-CV-6275, 2017 WL 607579, at *16 (S.D.N.Y. Feb. 14, 2017) (the SRO "thoroughly analyzed the hearing record, providing a detailed description of the information that each individual report and evaluation contained.").

This Court lacks the expertise to competently undertake such an analysis, and hesitates to do so in light of <u>L.O.</u> The Court holds only that there were two procedural violations: the DOE failed to timely reevaluate C.B. in her areas of need, and the CSE did not review her most recent evaluations during the IEP meeting. Rather than consider these violations in isolation, the Court turns to the alleged substantive inadequacies, which analysis is informed by these procedural violations. <u>A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.</u>, 553 F.3d 165, 172 (2d Cir. 2009) ("[A]dequate compliance with the [IDEA] procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP.").

## II. Prong One, Part Two: Substantive Adequacy

The Court next considers the substantive adequacy of the IEP. To satisfy this prong, the DOE must offer the child special education and related services that are "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." <u>Endrew F.</u>, 137 S.Ct. at 999. The focus on the individual child is critical. The IEP "is not a form document," and must reflect "careful consideration of the child's present levels of achievement, disability and potential for growth." <u>Id.</u> A valid IEP must "set out a plan for pursuing academic

and functional advancement," that is "focused on student progress" and provides opportunities to "meet challenging objectives." Id. at 999-1000. The Court is tasked with examining "the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan," such as test scores and similar objective criteria. A.M., 845 F.3d at 541 (internal citations omitted); see also J.D., 677 F. App'x at 712. The DOE bears the burden to "demonstrate the appropriateness of the IEP." Id., citing M.H., 685 F.3d at 224-25. A finding that the IEP was substantively inadequate "automatically entitles parents to reimbursement." R.E., 694 F.3d at 190.

The Parents argue that the IEP's present levels of performance section is deficient, that the IEP's goals are unattainable and incomplete, and that the CSE's 12:1:1 class placement recommendation was inappropriate for C.B.

## A. Present Performance Levels and Goals

The IEP must report on four aspects of the student's present levels of performance: (1) academic achievement, functional performance and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs. 8 NYCRR § 200.1(ww)(3)(i). This present levels of performance section shall "indicate the individual needs of the student" in each of those four areas, including "how the student's disability affects involvement and progress in the general education curriculum." Id. at § 200.4(d)(2)(i); see also 20 U.S.C. § 1414(d)(1)(A)(i)(I). The CSE's evaluation of a student's abilities should never rely on "any single measure or assessment as the sole criterion for determining . . . an appropriate educational program for the child." 20 U.S.C. § 1414(b)(2)(B). The IEP must also include "a statement of measurable annual goals, including academic and functional goals, designed to . . . enable the child to . . . make progress" and "meet each of the child's other educational needs that

result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II); see also 8 NYCRR § 200.4(d)(2)(iii)(A); 39 C.F.R. § 300.320(a)(2)(i).

The Parents' primary challenge relates to the Psychoeducational Report, which they claim was not incorporated into the IEP. The IEP does not indicate C.B.'s borderline I.Q. score of 75, and thus, they argue, does not reflect C.B.'s cognitive deficits. ECF 15-2, Pl. Memo. of Law, at pp. 20, 23. The Parents also contend that C.B.'s social deficits and management needs are not accurately addressed in the IEP. Id. at pp. 23, 32-33. As a result, they claim that the IEP fails to include goals to address some of C.B.'s educational needs, and includes goals that are inappropriately overreaching. Id. at pp. 25-27.

Here again, both the SRO and IHO decisions summarily hold that the IEP is sufficient and consistent with the evaluative materials without analysis and without acknowledging conflicting evidence and testimony. Neither decision warrants deference. The SRO held that the present levels of performance section was sufficient because "a comparison of the evaluative information with the April 2012 IEP shows that the present levels of performance directly and accurately reflected the information available to and considered by the April 2012 CSE," and that the CSE used input from the parents, JCSE staff and evaluative material to develop that section. SRO Dec. at p. 7. In support, the SRO string cites to transcript pages from Ms. Fuchs' testimony, the five reports available to the CSE, and the last page of the IEP which lists the names of the CSE team participants. Id. Regarding the IEP goals, the SRO cites to the pages of the IEP on which the goals appear and states, without more, that the "goals indicated in the IEP are appropriate and specifically address her deficits." SRO Dec. at 10.[11]

---

[11] The IHO similarly held that the "IEP indicated a detailed description of the student's deficits, needs and current abilities," and that despite omitting C.B.'s I.Q. score, the IEP "indicates a thorough recitation of the students' language, academic, social and OT deficits." IHO Dec. at p.

Both decisions lack "thorough and careful" analysis to warrant deference on this point, and they are belied by a preponderance of the objective evidence. Walczak, 142 F.3d at 129; see also M.H., 685 F.3d at 249 (SRO's "conclusory statement does not evince thorough and well-reasoned analysis that would require deference"). Neither decision analyzes the IEP's adequacy in light of C.B.'s particularized needs. See 8 NYCRR § 200.4(d)(2)(iii)(a); compare to C.R. v. New York City Dep't of Educ., 211 F. Supp. 3d 583, 611 (S.D.N.Y. 2016). Instead, they could hold true for countless students. Moreover, while the Court generally defers to the specialized knowledge and educational expertise of the administrative reviewers on these types of questions, Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 382 (2d Cir. 2003), there is no indication that these holdings are grounded in that expertise.

Turning first to the present levels of performance section, the CSE copied the three Progress Reports almost verbatim: the IEP quotes the Academic Progress Report and Occupational Therapy Update almost in their entirety, and cherry-picks sentences from the Speech Progress Report. Compare IEP at pp. 1-2 to Exhs. 4, 5, 6. On its face, the IEP does not incorporate the Psychoeducational Report, the classroom evaluation report or any additional input from the CSE team. See generally IEP.[12] As a result, the IEP is consistent with the Psychoeducational Report only to the extent that the Progress Reports are consistent with the Psychoeducational Report. However, the Psychoeducational Report identifies a number of C.B.'s deficits that do not appear in the IEP. In addition to the omission of C.B.'s I.Q. score, the

---

10. Regarding the IEP goals, the IHO states that they "are appropriate and specifically address her deficits." Id. In support of those holdings, the IHO cites only to the IEP itself. Id.

[12] Ms. Fuchs testified that the Psychoeducational Report was incorporated in the first subsection of the IEP, titled "Evaluation Results." Tr. 92. That section contains an overview of C.B.'s educational history and past school placements, but does not contain information from the Psychoeducational Report. See IEP at p. 1.

Psychoeducational Report highlights C.B.'s low working memory and inability to define words as areas of concern.  Ex. 9 at pp. 2, 4.  The report scores her below age expectancy for perceptual motor skills, at an "age equivalent of 5.2-5.3 years."  Id. at p. 3.  There is no explanation for why the IEP fails to mention that C.B struggles in these areas.

Similar omissions persist throughout the IEP.   For example, the record indicates that C.B. has significant difficulty with focusing and distractibility: the Psychoeducational Report explains that C.B. was "easily distracted" and "fidgety," (Ex. 9 at p. 1), and Ms. Rosen and Ms. Rabinowitz testified that C.B. had "difficulty focusing," is "easily distractible," and requires a behavior plan for focusing, noting that she works best with a cardboard divider around her desk to help her focus and "block out other distractions."  Tr. 214, 362-63.  Conversely, the IEP states that C.B. "works independently for roughly 15 minutes," and that she "demonstrates good attention span and good activity tolerance."  IEP at pp. 1-2.  These statements, taken directly from the Academic Progress Report and the Occupational Therapy Update, are plainly inconsistent with Psychoeducational Report and testimony from the JCSE teachers.  See Ex. 5 at p.1; Ex. 4 at p. 1.  Nothing in the IEP attempts to reconcile this inconsistency, or even recognize that it exists.

In terms of social needs, the IEP quotes from the Academic Progress Report to state that C.B. "initiates and maintains conversation with her peers," and "generally maintains eye contact." Ex. 4 at p. 1; IEP at p. 2.  But the Psychoeducational Report reads that "eye contact was inconsistent," that C.B. said "she doesn't have friends in the class," and recommends management techniques to encourage C.B. to engage socially with her peers.  Ex. 9 at pp. 1, 4. Additionally, the classroom evaluation report indicates that C.B. did not engage with her peers when they took a vote to go outside, and Ms. Fuchs testified that C.B. was "quiet," "withdrawn,"

and "didn't have an opinion." Ex. 3; Tr. 54. It is clear that when crafting the IEP, the CSE did not engage in a thoughtful analysis of the evidence before it, or make any attempt to reconcile inconsistent findings. Instead, they blindly copied the Progress Reports without divergence. As a result, the IEP omits and potentially misstates a number of C.B.'s educational deficits.[13]

In turn, the performance levels section directly informs the IEP's goals, which are also deficient. The IEP has fifteen goals related to speech, reading, phonetic awareness, math, counseling, occupational therapy and social needs. Not surprisingly, the IEP lacks goals to address those deficits that were omitted from the present levels of performance section: there are no goals related to memory, perceptual motor skills or encouraging social engagement with peers, which the record indicates are some of C.B.'s greatest areas of need. Ex. 9 at p. 2; see also Tr. 363-65. Additionally, there is no goal related "rhyming and discriminating initial sounds, final sounds, segmenting words and blending words," even though the IEP and Psychoeducational Report both indicate C.B. struggles in that area. IEP at p. 1; Ex. 9 at p. 3.[14] Ms. Rabinowitz testified that there were no math goals for place values, money skills or reading, writing and sequencing numbers, and no adequate goals related to distractibility and focusing. Tr. 365. The only goal related to social skills requires C.B. to cooperate with teachers and

_____

[13] The "management needs" section, which simply reads "none needed," is clearly inadequate. IEP at p. 2. The Progress Reports and Psychoeducational Report describe numerous management tools required to help C.B. learn, and Ms. Fuchs testified that C.B.'s related services (counseling, speech and occupational therapy) should have been listed under that subsection. Tr. 73-74. However, as the SRO noted (SRO Dec. at p. 7), the other subsections address those management tools throughout. They note that C.B. needs repetition, multi-sensory techniques, presentation of material in "small chunks," visual aids and sequencing cards, direct instruction, verbal cueing and opportunities to practice. IEP at pp. 1-2. It would exalt form over substance to invalidate this IEP solely because it fails to list these management techniques under the management subsection of the IEP.

[14] Remarkably, the only goal related to phonetical awareness calls for C.B. to orally "read passages or stories fluently," even though C.B. is a nonreader. IEP at p. 4.

follow rules, although all the reports indicate that C.B. was sweet, compliant and eager to please. IEP at p. 6; Exhs. 3, 4, 5, 9.

The Parents challenge the reading goals most forcefully. It is undisputed that C.B. was a non-reader, who recognized only "several letters of the alphabet." IEP at p. 1; Ex. 4, Academic Progress Report, at p. 1; Ex. 9, Psychoeducational Report at p. 3. Ms. Fuchs testified that C.B. was writing words like a three year old. Tr. 52. Nonetheless, there are no goals related to learning the alphabet; instead, the goals presume that C.B. is a reader, requiring her to, in part, "identify[] the main ideas of stories," analyze the emotions and motivations of characters, and improve her vocabulary by using "context clues" within sentences and paragraphs to identify unknown words when reading. IEP at pp. 3-4. Ms. Fuchs testified that these goals were aimed towards "interpreting the information and she is—she is making—making evaluations of it, when she critically thinks." Tr. 75. There is no evidence, however, that interpreting and critical thinking skills are goals particularized to C.B.'s individual needs and disability. Indeed, Ms. Rabinowitz testified that these goals were unattainable because C.B. "wasn't decoding CVC[15] well, so she's nowhere near being able to do something like that . . . she wasn't reading sentences, so she wasn't ready for that." Tr. 364.

In fact, the DOE offered no evidence that actually supports the appropriateness of the IEP goals in light of C.B.'s individual needs. 8 NYCRR § 200.4(d)(2)(iii)(a). Ms. Fuchs' testimony is the DOE's only evidence to support the goals, and consists largely of her listing what type of goal each was (i.e. "the third goal is a reading goal," "[t]he next one is a phonetic awareness goal."). Tr. 75-76. She did not testify as to how the CSE considered C.B.'s specific educational needs in developing the goals or how the goals addressed those needs. Conversely, Ms.

---

[15] CVC are three letter words with a consonant-vowel-consonant, such as "cat." Tr. 235.

Rabinowitz testified about the substance of many of the goals and in doing so, explained why they were inappropriate in light of C.B.'s abilities. Tr. 363-66.

The IEP was not designed to enable C.B. to make progress in light of her educational needs. The CSE did not incorporate all of the evaluative material and evidence before it to accurately summarize C.B.'s educational needs and deficits, instead it merely copy and pasted the Progress Reports directly into the IEP. Most obviously, the Psychoeducational Report (which was the only clinical report available) uncovered deficiencies relevant to C.B.'s educational needs, but was ignored in drafting the IEP. This resulted in an absence of goals in numerous areas of need, and facially unattainable reading goals.

Without doubt, these deficiencies are inextricably tied to the procedural violations discussed <u>supra</u>. <u>P.L.</u>, 56 F. Supp. 3d at 163 (the presence "of procedural violations informs [the Court's] determination of substantive adequacy even when the violations themselves do not deny a FAPE.") <u>citing</u> <u>C.F. ex rel. R.F. v. New York City Dep't of Educ.</u>, 746 F.3d 68, 81 (2d Cir. 2014). Indeed, those violations cast doubt on whether the IEP's substantive deficiencies resulted from "a deliberate decision on the part of the CSE based on its specialized knowledge and educational expertise" or from the CSE's failure to reevaluate C.B. and review her existing evaluations. <u>L.O.</u>, 822 F.3d at 111; <u>see also</u> <u>S.Y. v. New York City Dep't of Educ.</u>, 210 F. Supp. 3d 556, 576 (S.D.N.Y. 2016). For all the reasons indicated, the Court holds that the IEP's present levels of performance and goals were substantively inadequate and C.B. was thus deprived of a FAPE.

## B. 12:1:1 Class Placement

The Parents also challenge the IEP's class placement recommendation. They claim a 12:1:1 class size was too large to meet C.B.'s needs, and that the DOE failed to consider the

Mother's request that C.B. be placed in a smaller classroom, thereby denying them a meaningful opportunity to participate in the IEP process. ECF 15-2, Pl. Memo of Law, at pp. 24-36. The DOE argues that the Court should defer to the SRO's and IHO's decisions because there is sufficient evidence that C.B. would make progress in a 12:1:1 class and "issues such as class size are best left to the district and its educational experts." ECF 14-2, Def. Memo. of Law, at p. 25.

Indeed, "challenges to class size and student teacher ratios involve questions of methodology more appropriately answered by the state and district decision-makers than by federal judges." C.M., 2017 WL 607579 at *21 (citing cases). However, where it "appears plain that, contrary to the findings of the SRO," the placement was "not adequately designed to address and improve the child's educational needs, the administrative officer's analysis is deserving of no deference." A.M., 845 F.3d at 543 (internal citations omitted).

On this issue, the SRO cited 8 NYCRR § 200.6(h)(4)(i), which requires that a child with management needs that interfere with the instructional process be placed in a classroom with no more than 12 students, at least one teacher and one paraprofessional. The SRO held that C.B.'s "learning and management needs were significant enough to interfere with the instructional process," and therefore she was appropriately placed in "a 12:1+1 special class placement at a community school." SRO Dec. at p. 8. The SRO failed to address the Parents' challenge that a 12:1:1 classroom was too large for C.B. and that the CSE did not consider a smaller class placement, and thus its holding does not warrant deference. E.H. v. New York City Dep't of Educ., 164 F.Supp. 3d 539, 553 (S.D.N.Y. 2016). The IHO's decision is deficient for the same reason, and also not entitled to deference. See e.g. J.C. v. Katonah-Lewisboro Sch. Dist., No. 16-1838, 2017 WL 1906729, at *1 (2d Cir. May 9, 2017) (summary order) (the hearing officer "was

not required to automatically accept the [] recommendations as to class size, but he was required

to consider the recommendations and, if he rejected them, to convincingly explain why.").[16]

There is limited evidence in the record as to the appropriateness of a 12:1:1 class size.

Neither the classroom evaluation report, the Psychoeducational Report, nor any of the three

Progress Reports suggests an appropriate class size for C.B.  See Exhs. 3, 4, 5, 6, 9.  The DOE's

only evidence supporting a 12:1:1 classroom size was testimony from Ms. Fuchs, who met C.B.

for approximately one hour during the classroom evaluation at the JCSE.  She observed that C.B.

was passive, failed to interact with the other students, and needed the teacher's help to complete

the assignment.  Ex. 3.  She testified about the recommended class size as follows:

> Q: . . . why did the team recommend a [12:1:1] special class for [C.B.]? . . .
>
> A: Okay.  Because there is up to 12 children in the class, one teacher, one
> paraprofessional.  We felt that she would be able to get the—the necessary attention.
> You know she would be learning with children that would be – that might be within the
> same type of focus, you know, but even though she has her own, you know, Individual
> Education Program, we felt that this would be a proper placement for her to – to succeed
> in reaching her goals. (Tr. 77) . . .
>
> A: We felt that that would be—that that could appropriately address [C.B.]'s needs.  That
> we thought that the class, if she was in a Department of Education program, that type of
> class could appropriately address her goals, her needs, her related services, and could
> help her to achieve academic success. (Tr. 81-82).

Ms. Fuchs later testified that the CSE never considered recommending a class of fewer than 12

students.  Tr. 96.  This testimony makes no specific reference to C.B.'s particular circumstances

---

[16] The IHO notes that C.B. was making progress in a small setting at the JCSE, but there was
nothing "in the record that specifically indicates that the student could not learn in a classroom
with a slightly larger student to teacher ratio," and there was "no clinical support for a conclusion
that the size of the recommended placement was inappropriate for the student."  IHO Dec. at p.
11.  This holding improperly places the burden on the Parents to show why a placement is
inappropriate, and is inconsistent with the IHO's simultaneous ruling that the available
evaluative information was sufficient to assure C.B. a FAPE.  IHO Dec. at pp. 10-11.

and needs, and it does not explain how any evaluative information affirmatively shows that a 12:1:1 class placement will allow C.B. to progress.  P.L., 56 F. Supp. 3d at 165.

Conversely, the Parents' three witnesses testified that a 12:1:1 placement would be too large for C.B.  Ms. Rabinowitz testified that a 12:1:1 class would be "very difficult" because of C.B.'s language and focusing issues, and that C.B. needs a "very small class" with no more than eight students.  Tr. 360-61, 400.  The Mother testified that during the IEP meeting she told the CSE that a 12:1:1 class was "too big."  Tr. at 274, 293.  Ms. Rosen testified that that class size would be "too big, because I think she's going to be distressed.  And I also think that she needs smaller groups for more direct instruction in reading and math."  Tr. 230.

The private school's class size does not bind the CSE in formulating the IEP.  A.M., 845 F.3d at 545.  However, the DOE's failure to consider a smaller classroom size may deny a student a FAPE when all witnesses familiar with the student testify that she required a certain placement, and that testimony is not adequately rebutted by DOE witnesses.  See C.F., 746 F.3d at 81.  Indeed, if the "consensus of the evaluative materials and all witnesses familiar with the child . . . specifically recommend the continued need" for a certain placement, the DOE must point to evidence sufficient to counter those recommendations in order to appropriately recommend a different placement for the student.  A.M., 845 F.3d at 545; see also J.E. v. New York City Dep't of Educ., 229 F. Supp. 3d 223 n.4 (S.D.N.Y. 2017) ("Where the parent and the student's prior teacher advocate for a more restrictive ratio, there is reason to believe that the IEP's deviation toward a less restrictive classroom environment—without documentation indicating that such a deviation is appropriate—constitutes a substantive violation of the IDEA.").

It is the DOE's burden to prove by a preponderance of the evidence that the 12:1:1 class ratio would have allowed C.B. to progress. Ms. Fuchs' testimony does not satisfy that burden. Ms. Fuchs met C.B. one time in a classroom with seven students, and testified in generic language about the appropriateness of a 12:1:1 classroom. Her anemic testimony is countered by the testimony of all three witnesses with intimate knowledge of C.B. that she needed a smaller class size, and the IEP's acknowledgment that C.B. was making "slow but steady progress" in her class of seven students at the JCSE. Additionally, Ms. Fuchs testified that the CSE did not even consider recommending a class size of fewer than 12 students, in clear violation of its obligation to consider the Mother's request for a smaller, 7:1:1 classroom. E.H., 164 F.Supp. 3d at 553 ("CSE was obligated to consider the Parent's point of view that a [12:1:1] placement was not appropriate for [the student] and [7:1:1] was necessary, particularly in light of the fact that [the student] was then being educated in a [7:1:1] ratio.").

Moreover, "the issue of classroom placement ratio cannot be separated from [] the procedural violations discussed above." C.F., 746 F.3d at 81. "Indeed, we are left to wonder whether the DOE would have reached the same conclusions and recommended the same deficient services in the IEP . . . had the DOE adequately complied with the IDEA's procedures in the first instance." A.M., 845 F.3d at 545. The witnesses who recommended a smaller class size did so out of concerns about C.B.'s language, social and focusing issues, which should have been assessed by the appropriate reevaluations. The failure to reevaluate resulted in a lack of information clinically tying C.B.'s deficits to a class size recommendation, which can be decisive in making an appropriate placement recommendation. See e.g. J.C., 2017 WL 1906729, at *1.

The DOE failed to prove that C.B. could make adequate progress in a 12:1:1 class placement, and thus deprived her of a FAPE. This conclusion is "inescapable" when combined

with the CSE's failure to reevaluate C.B., failure to consider her existing, initial evaluations, failure to thoroughly and accurately summarize C.B.'s present performance levels, and the deficiency and lack goals in numerous areas of need. See, e.g. A.M., 845 F.3d at 545; C.F., 746 F.3d at 81. The analysis now turns to the remaining prongs of the Burlington/Carter inquiry to determine whether the Parents are entitled to reimbursement.[17]

### III. Prong Two: Appropriateness of the Parents' Unilateral Placement at the JCSE

The parents of a student who is denied a FAPE are entitled to reimbursement for the tuition at their unilateral placement only if that placement is "reasonably calculated to enable the child to receive educational benefits . . . such that the placement is likely to produce progress, not regression." T.K. v. New York City Dep't of Educ., 810 F.3d 869, 877 (2d Cir. 2016) (internal citations omitted). Here, the IHO held that the JCSE provided an appropriate program for C.B. IHO Dec. at p. 12. The DOE did not appeal that portion of the IHO's decision, not does it dispute that holding now, and the Court need not address this prong of the analysis.

### IV. Prong Three: Equitable Considerations

In the final step of a tuition reimbursement claim, the Court determines whether equitable considerations favor the parents. M.H., 685 F.3d at 254. The SRO did not reach this issue. SRO Dec. at pp. 9-10. The IHO held that the equities favored the Parents, because there was "nothing in the record which sustains a finding that the parents have not cooperated with the CSE." IHO Dec. at p. 13. The IHO noted that the Mother attended the IEP meeting, visited P.S. 91 and

---

[17] The Parents also challenge the DOE's proposed placement of C.B. at P.S. 91. They argue that the IEP required C.B. to be in second grade for the 2012-2013 school year, but that she would have been placed in a fourth grade classroom as P.S. 91, had she attended. ECF 15-2, Pl. Memo. of Law, at pp. 38-39. On this basis, they say that P.S. 91 was unable to implement the IEP and the DOE failed to offer C.B. a FAPE. In light of our holding as to the IEP's procedural and substantive inadequacies, this argument need not be addressed.

timely notified the DOE that she found the school inappropriate and planned to unilaterally place C.B. in another school.  Id.

There is additional evidence that supports this holding.  First, the Mother made numerous attempts to engage with the DOE regarding the IEP and school placement.  After she failed to receive a school placement by August 15, she proactively contacted the DOE to ask about the placement notice.  Pl. 56.1 St. at ¶ 60.  She then immediately called P.S. 91 to schedule a tour and reached out to the DOE for more information about the placement when she was told she could not visit until September.  Ex. L.  After timely visiting the placement, she wrote to the DOE again to express her concerns and notify them of her intention to unilaterally place C.B. at a private school.  Ex. D.  The DOE never responded to those communications which illustrate the Mother's good faith attempts to work with the DOE, and the DOE's unexplained refusal to communicate openly with the Parents.

Second, it appears that the DOE withheld information from the Parents about the proposed school placement at P.S. 91, namely that C.B. would have been placed in a fourth grade classroom.  The Mother toured the school in early September, after the school year had begun, at which point the DOE undoubtedly knew C.B. would be placed in that classroom.  Still, the Mother was not shown the class into which her daughter would be placed and was never told it was a fourth grade classroom, despite her numerous communications asking for information about the class profile.  The IDEA "does not entitle a school district to play fast-and-loose with the disabled student's placement" in this manner.  M.H. v. New York City Dep't of Educ., 712 F. Supp. 2d 125, 167 (S.D.N.Y. 2010), aff'd, 685 F.3d 217 (2d Cir. 2012) (equitable considerations weighed in Parents' favor when the DOE was "less than forthcoming about the nature of [the student's] recommended placement").

Third, the DOE was on clear notice of its need to reevaluate C.B., but still failed to do so. The Parents initiated a due process proceeding related to the 2011-2012 school year well before the 2012 IEP meeting, primarily challenging the DOE's failure to reevaluate C.B., but the CSE did not conduct a single reevaluation for consideration in her 2012 IEP.

The DOE argues that the Parents never intended to accept a public school placement. They say that the DOE called the Parents three times to reevaluate C.B. in January, March and April 2012, but that no one picked up until the third call when the Mother stated she was not interested in a public school placement. ECF 14-2, Def. Memo. of Law, at p. 30. They allege that at the CSE meeting, the Mother stated her intent to seek reimbursement for C.B.'s placement at the JCSE. Id. Other evidence in the record weighs against these claims. For example, the IEP also states that "Parent stated that she would like an IEP to explore programs that would be appropriate for her daughter's academic needs," and that "she would like an IEP at this time." IEP at p. 10. Similarly, the Mother testified that she never indicated an intent to be reimbursed and that she genuinely sought the best placement for her daughter. Tr. 275. She also testified that the CSE pressured her to accept an "IESP with SETSS" despite her repeated request for an IEP. Tr. 274, 288-89.

A weighing of the equities tips decidedly in the Parents' favor. Because they have satisfied all three prongs of the analysis, the Parents are entitled to reimbursement of C.B.'s tuition for the 2012-2013 school year.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted, and the Defendants' cross-motion for summary judgment is denied. The decisions of the Impartial Hearing Officer and State Review Officer are reversed. Defendants are ordered to reimburse Plaintiffs for C.B.'s tuition at the JCSE for the 2012-2013 school year, minus any costs that have already been paid pursuant to 20 U.C.S. § 1415(j). Plaintiffs may submit their request for attorney's fees to the Court with proper documentation.

SO ORDERED.

Dated:       Brooklyn, New York
            September 28, 2017

_____/s/_____
I. Leo Glasser